**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
FEBRUARY 6, 2025

CHIEF JUSTICE

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

|  |  |
|---|---|
| IAN ATKERSON, individually and as personal representative of the ESTATE OF RUSTIN ATKERSON, | No. 102795-8 |
| Petitioner, | En Banc |
| v. | |
| STATE OF WASHINGTON, DEPARTMENT OF CHILDREN, YOUTH, AND FAMILIES, John and Jane Doe 1-10, | Filed: February 6, 2025 |
| Respondents. | |

GONZÁLEZ, J.—Washington State has the power and the obligation to act to protect the children of our state. Historically, that power has also been used in ways that have caused harm to communities, to parents, and to the very children the State is attempting to protect. Consequently, in prior cases this court recognized an implied cause of action in our child abuse and neglect statutes that allows children and parents who have been the victims of harmful placement decisions to vindicate their rights in court.

Our legislature has also responded by creating a statutory framework aimed at limiting the harm to families from State intervention while not chilling social workers from intervening when necessary to protect the child. As part of that effort, the legislature limited the potential liability Washington State and its agents face for "acts or omissions in emergent placement investigations of child abuse . . . unless the act or omission constitutes gross negligence. Emergent placement investigations are those conducted prior to a shelter care hearing under RCW 13.34.065." RCW 4.24.595(1). The purpose of a shelter care hearing is for a judge to determine, when there is reason to believe the child is being abused or neglected, whether a child can be returned to or kept in the family home. *See* RCW 13.34.065. The limited liability standard of RCW 4.24.595(1) "includ[es], but [is] not limited to, any determination to leave a child with a parent."

The primary question before the court is whether RCW 4.24.595(1) applies to the early stages of child abuse and neglect investigations when social workers have not decided whether to seek a shelter care hearing. We conclude that it does, affirm the Court of Appeals, and remand to the trial court for further proceedings consistent with this opinion.

FACTS

This case comes out of the tragic death of a very young child, Rustin Atkerson. As litigation relating to Rustin's death is ongoing, we will touch on the facts only briefly. When Rustin was a little more than one year old, his parents, Ian Atkerson and Elaine Hurd, separated.[1] A court ordered joint custody and approved an agreed parenting plan in early June 2017.

At around the same time, the Department of Children, Youth, and Families (DCYF) received a report that Rustin had a broken arm. DCYF opened an investigation and a caseworker began investigating. The caseworker, along with a police officer, attempted to visit Hurd at her home. Shortly afterward, DCYF received another report concerning Rustin.

The caseworker met with Hurd to discuss Rustin's injuries, requested medical records, spoke with other family members, and shared information with the local police. At this point, the record suggests that the caseworker was unaware that Hurd sometimes stayed with a boyfriend who had a history of domestic violence.

Two weeks after the original referral and while DCYF's investigation was still in progress, Rustin was taken to the hospital with severe head trauma. Rustin

---

[1] Due to Rustin and Ian's common family name, we use Rustin's first name. No disrespect is intended.

died of his injuries about six weeks later. Hurd's boyfriend was arrested in connection with Rustin's injuries, but the record suggests he was not charged.[2] Hurd pleaded guilty to second degree criminal mistreatment for her part in Rustin's death.

Ian Atkerson and Rustin's estate (collectively Atkerson) sued DCYF, contending its negligent investigation caused Rustin's death.

DCYF moved for summary judgment, contending that to prevail on a negligent investigation claim, the plaintiffs would have to establish "*both*: (1) the State acted with gross negligence in a child abuse investigation *and* (2) the investigation resulted in a 'harmful placement' decision." Clerk's Papers (CP) at 215 (citing *M.W. v. Dep't of Soc. & Health Servs.*, 149 Wn.2d 589, 70 P.3d 954 (2003)). Gross negligence is "the failure to exercise slight care." *Nist v. Tudor*, 67 Wn.2d 322, 324, 407 P.2d 798 (1965) (citing *Crowley v. Barto*, 59 Wn.2d 280, 367 P.2d 828 (1962)). The State argued that as the caseworker had begun an investigation, spoken with both of the parents and other family members, visited both parents' homes, forwarded intakes to law enforcement, and ordered medical records, DCYF had shown at least slight care and thus Atkerson could not show gross negligence. Atkerson argued that he needed show only ordinary negligence,

---

[2] We recognize that the Court of Appeals concluded Hurd's boyfriend caused Rustin's death. *See Atkerson v. Dep't of Child., Youth & Fams.*, 29 Wn. App. 2d 711, 714, 542 P.3d 593 (2024).

and that summary judgment was inappropriate even under the gross negligence standard.

In support of its summary judgment motion, DCYF offered a declaration from retired Judge Kitty Ann Van Doorninck. DCYF also sought to have Judge Van Doorninck testify as an expert witness at trial. Judge Van Doorninck declared and offered to testify that a reasonable judicial officer would likely not have removed Rustin from his mother's care before he received his fatal injury based on the information known to DCYF at the time. In Judge Van Doorninck's view, the available evidence was insufficient for a judge to remove Rustin from his mother's care.

In opposition to DCYF's motion for summary judgment, Atkerson offered a declaration and report from retired Child Protective Services (CPS) social worker Jane Ramon. Ramon declared that DCYF's employees "failed to exercise slight care during their investigation, risk assessment, and safety planning while handling multiple CPS referrals regarding Rustin," and that had they followed their own procedures and met the standard of care, "Rustin would not have sustained injuries that were ultimately fatal." CP at 892. She stressed the severity of Rustin's injuries and the fact that DCYF had not discovered Hurd's boyfriend and his criminal and CPS history. Ramon opined that a judge would "have taken action to protect Rustin" had DCYF's investigation met the standard of care. CP at 900.

Atkerson also moved to strike Judge Van Doorninck's testimony and to strike her from the witness list. He argued her testimony was improper under the canons of judicial conduct, was a usurpation of the trial judge's role, and would likely be given too much weight by the jury. Atkerson later conceded Judge Van Doorninck could appropriately testify as to procedure. DCYF argued that nothing in the canons prevented retired judges from testifying, that Judge Van Doorninck would testify appropriately without abusing the prestige of office, and that her testimony was appropriate under ER 702.

The trial court largely granted Atkerson's motion to exclude Judge Van Doorninck's testimony, though it left open the possibility she could testify as to procedure. The court rejected the argument that her testimony would violate the canons of judicial conduct but concluded having her testify would be unduly prejudicial under ER 403.

The trial court denied DCYF's motion for summary judgment, concluding that Atkerson "need only prove that the Defendant was negligent, not grossly negligent, to prevail at trial." CP at 972. The trial court did not reach the State's second defense theory, that no reasonable jury could conclude that DCYF's investigation caused a negligent placement decision. On the State's motion for reconsideration, the trial court reaffirmed its original decision but paused further trial court proceedings and certified the case for review under RAP 2.3(b)(4).

The Court of Appeals reversed the trial court's rulings and remanded, concluding that the applicable standard of care was gross negligence and that the trial court erred in excluding Van Doorninck's testimony. *Atkerson v. Dep't of Child., Youth & Fams.*, 29 Wn. App. 2d 711, 715, 542 P.3d 593 (2024). We granted Atkerson's petition for review. The Washington State Association for Justice Foundation and the Law Offices of Ressler & Tesh submitted amicus briefs on behalf of Atkerson.

ANALYSIS

DCYF has obligations to protect children from abuse and neglect, preserve families, and respect the rights of parents. *See* RCW 13.34.020, .050; RCW 26.44.050; *In re Dependency of L.C.S.*, 200 Wn.2d 91, 108, 514 P.3d 644 (2022); *M.W.*, 149 Wn.2d at 595 (citing *Tyner v. Dep't of Soc. & Health Servs.*, 141 Wn.2d 68, 79-81, 1 P.3d 1148 (2000)). These obligations are often in tension with each other.

Once DCYF has accepted an investigation, it generally has up to 90 days to complete it. RCW 26.44.030(13). This time limit is part of a broader attempt to minimize the potential harm of state interference in a family while still protecting children from neglect and abuse. *See* RCW 26.44.010. A trial court can order a child be taken into the State's care based on a petition under RCW 13.34.050. In

7

addition, certain designated professionals may take a child into care without first going into court. RCW 13.34.055; RCW 26.44.050.

Once a child has been removed from their family home, the State has 72 hours, excluding weekends and holidays, to bring the matter before a court for a shelter care hearing. RCW 13.34.060(1). At a shelter care hearing, a court will determine if a child can safely be returned home during a dependency action. RCW 13.34.065(1)(a).

The State is potentially liable to both parents and children for negligent investigation of child abuse. *See Tyner*, 141 Wn.2d at 77, 82. The State may be liable for negligent investigation when it "'gather[s] incomplete or biased information that results in a harmful placement decision, such as removing a child from a nonabusive home, placing a child in an abusive home, or letting a child remain in an abusive home.'" *Desmet v. Dep't of Soc. & Health Servs.*, 200 Wn.2d 145, 160, 514 P.3d 1217 (2022) (alteration in original) (quoting *M.W.*, 149 Wn.2d at 602).

1. SCOPE OF RCW 4.24.595

Whether section .595 applies throughout a child abuse investigation is a question of statutory interpretation we review de novo. *Guillen v. Contreras*, 169 Wn.2d 769, 774, 238 P.3d 1168 (2010) (citing *Dreiling v. Jain*, 151 Wn.2d 900, 908, 93 P.3d 861 (2004)). Our goal in interpreting statutes "is to ascertain and

carry out the Legislature's intent." *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9, 43 P.3d 4 (2002) (citing *State v. J.M.*, 144 Wn.2d 472, 480, 28 P.3d 720 (2001)). To make that determination, we consider the statutory language in the context of "all that the Legislature has said in the statute and related statutes which disclose legislative intent about the provision in question." *Id.* at 11. If we conclude a statute is ambiguous, we may turn to legislative history or other aids to statutory construction. *Id.* at 12 (citing *Cockle v. Dep't of Lab. & Indus.*, 142 Wn.2d 801, 808, 16 P.3d 583 (2001)). "'Statutes must be interpreted and construed so that all the language used is given effect, with no portion rendered meaningless or superfluous.'" *City of Seattle v. State*, 136 Wn.2d 693, 698, 965 P.2d 619 (1998) (quoting *Whatcom County v. City of Bellingham*, 128 Wn.2d 537, 546, 909 P.2d 1303 (1996)).

RCW 4.24.595 says in full:

(1) Governmental entities, and their officers, agents, employees, and volunteers, are not liable in tort for any of their acts or omissions in emergent placement investigations of child abuse or neglect under chapter 26.44 RCW including, but not limited to, any determination to leave a child with a parent, custodian, or guardian, or to return a child to a parent, custodian, or guardian, unless the act or omission constitutes gross negligence. Emergent placement investigations are those conducted prior to a shelter care hearing under RCW 13.34.065.

(2) The department of children, youth, and families and its employees shall comply with the orders of the court, including shelter care and other dependency orders, and are not liable for acts performed to comply with such court orders. In providing reports and recommendations to the court, employees of the department of

> children, youth, and families are entitled to the same witness immunity
> as would be provided to any other witness.

In short, RCW 4.24.595(1) limits the liability of the State and its agents for negligently investigating child abuse or neglect under chapter 26.44 RCW to gross negligence. Once that investigation is over, subsection .595(2) limits the potential liability of DCYF and its agents when testifying and complying with court orders.

Atkerson argues that RCW 4.24.595(1) applies to only "(1) accelerated investigations, (2) generally conducted within the 72-hour period before a shelter care hearing, (3) when a child is removed from the parents pending the hearing, or removal is sought." Atkerson Suppl. Br. at 14. Atkerson stresses that section .595 concerns "emergent placement investigations," which, in Atkerson's view, concerns only emergencies. He argues that an "investigation is an 'emergent placement investigation' under RCW 4.24.595(1) *only* if it is connected to such a time-sensitive court decision." *Id.* In his view, "[i]f CPS does not take a child into custody and no hearing is scheduled under RCW 13.34.065, by definition its investigation is *not emergent.*" *Id.* at 18-19.

But RCW 4.24.595 does not apply only to acts or omissions that result in shelter care hearings. It also applies to "*any* determination to leave a child with a parent . . . or to return a child to a parent." RCW 4.24.595(1) (emphasis added). In that circumstance, *no* decision has been made to remove a child from their home or to petition to remove child from their home. Atkerson's interpretation would make

10

portions of .595 a nullity when a DCYF employee makes a "determination to leave a child with a parent," violating the principle that "[s]tatutes must be interpreted and construed so that all the language used is given effect, with no portion rendered meaningless or superfluous." *City of Seattle*, 136 Wn.2d at 698 (quoting *Whatcom County*, 128 Wn.2d at 546).

Atkerson also argues that this court's opinion in *Desmet* requires limiting the gross negligence standard to the time period immediately before emergent placement decisions or shelter care hearings. Atkerson Suppl. Br. at 16-17. But *Desmet* concerned the immunity embodied in RCW 4.24.595(2), which is built around witness immunity and the limited immunity given to those who implement court orders. 200 Wn.2d at 148. We concluded that immunity applied only to acts performed to comply with court orders, not to the department's own investigation and determination of whether accusations were founded. *Id.* *Desmet* also repeatedly emphasizes that RCW 4.24.595(1) imposes a gross negligence standard to child abuse investigations, consistent with the State's position here. *Id.* at 154, 155, 161. RCW 4.24.595(2) concerns a different stage in dependency cases.

Based on the plain language of the statute, we conclude that RCW 4.24.595 applies to child abuse investigations conducted under chapter 26.44 RCW.[3]

---

[3] Atkerson and amici have provided considerable legislative history. Some, but not all, of that legislative history supports Atkerson's interpretation. As the statute is not ambiguous, however,

Accordingly, we affirm the Court of Appeals that RCW 4.24.595 applies and that

to prevail at trial, Atkerson must establish that DCYF was grossly negligent.

2. MOTION TO STRIKE

Next, we turn to whether the trial court properly struck the proposed expert

testimony of retired Judge Van Doorninck. Judge Van Doorninck's declaration

suggests she would testify that a reasonable trial judge would not have ordered

Rustin into shelter care based on what the State knew at the time of his fatal injury.

The trial court struck Judge Van Doorninck's testimony under ER 403, concluding

it would carry a prejudicial amount of weight with the jury. Under ER 403,

relevant "evidence may be excluded if its probative value is substantially

outweighed by the danger of unfair prejudice."

Generally, a trial court's decision whether to admit or exclude evidence at

trial is reviewed for abuse of discretion and a trial court's decision whether to

admit or exclude declarations offered at summary judgment is subject to de novo

review. *State v. Powell*, 126 Wn.2d 244, 258, 893 P.2d 615 (1995) (citing

*Washburn v. Beatt Equip. Co.*, 120 Wn.2d 246, 283, 840 P.2d 860 (1992)); *Folsom*

*v. Burger King*, 135 Wn.2d 658, 663, 958 P.2d 301 (1998). The Court of Appeals

---

we will not turn to that legislative history. *Campbell & Gwinn*, 146 Wn.2d at 12 (citing *Cockle*, 142 Wn.2d at 808).

reviewed the trial court's decision de novo. *Atkerson*, 29 Wn. App. 2d at 728-29

(citing *Folsom*, 135 Wn.2d at 663).

We respectfully disagree with the Court of Appeals that de novo review of

the trial court's decision here is appropriate. Merely because the decision was

made in conjunction with a summary judgment motion is no reason to constrain the

trial court's discretion as to which witnesses may testify.

Instead, a trial court's decision whether to admit or exclude expert testimony

at trial under ER 403 is reviewed for abuse of discretion. *Gerlach v. Cove Apts.,

LLC*, 196 Wn.2d 111, 120, 471 P.3d 181 (2020). "A trial court abuses its discretion

if its decision is manifestly unreasonable or is based on 'untenable grounds, or for

untenable reasons,'" such as the misinterpretation of a statute. *In re Det. of

Duncan*, 167 Wn.2d 398, 402, 219 P.3d 666 (2009) (internal quotation marks

omitted) (quoting *Mayer v. Sto Indus., Inc.*, 156 Wn.2d 677, 684, 132 P.3d 115

(2006)).

But even under the more deferential standard of review, we conclude that the

trial court improperly excluded Judge Van Doorninick's testimony under ER 403.

Her testimony would go to one of the core issues in this case—whether any

negligence by the State caused a harmful placement decision. Nothing before us

suggests that probative value is outweighed by the mere potential prejudicial effect

of having a retired judge testify. The trial court is in the best position to guard

against any such prejudice by appropriately limiting the actual testimony at trial or through an appropriate jury instruction.

Atkerson also argues that it is inappropriate to have a judge testify because of the nature of their (in this case former) office. He calls our attention to an attorney discipline case where this court affirmed a hearing officer's decision not to call judges to testify as fact witnesses. Br. of Resp't at 56 (Wash. Ct. App. No. 39483-2-III (2023)) (citing *In re Disciplinary Proceeding Against Sanai*, 167 Wn.2d 740, 752, 225 P.3d 203 (2009)). But Sanai sought to have judges called as fact witnesses as to the underlying subject matter that sparked the discipline. *Sanai*, 167 Wn.2d at 751. As we noted in *Sanai*, "[e]vidence rules and the code of judicial conduct 'reflect a presumption against judicial testimony, which presumption warrants heightened scrutiny when a party seeks to require a judge to testify.'" *Id.* at 752 (quoting *United States v. Roth*, 332 F. Supp. 2d 565, 567 (S.D.N.Y.2004)). We concluded the hearing officer did not abuse his discretion in not allowing the judges to be subpoenaed. *Id.* at 753.

Here, by contrast, no party is seeking to require a judge to appear and be examined about their decisions in a particular case. Judge Van Doorninck is

appearing voluntarily as an expert, not as a compelled fact witness. The concerns that animated our analysis in *Sanai* are not present.

Atkerson also suggests that retired judges are prohibited from testifying under the Canons of Judicial Conduct. He suggests allowing a judge to testify as an expert is at least inconsistent with the rule that "[a] judge shall not abuse the prestige of judicial office to advance the personal or economic interests[] of the judge or others, or allow others to do so." CJC 1.3. But the canon does not suggest a retired judge may not testify as an expert. Certainly, a retired judicial officer should refrain from testifying in such a way that suggests they are to be afforded undue deference because of their former status as a judicial officer. But nothing in the canons categorically excludes a judge from giving appropriate expert testimony. We note that retired judges have been allowed to testify in the past. *See, e.g.*, *Petersen v. State*, 100 Wn.2d 421, 442, 671 P.2d 230 (1983).[4]

Finally, Atkerson argues that Judge Van Doorninck would improperly testify as to the law, which is the province of the presiding judge, not the province of witnesses. Br. of Resp't at 64 (Wash. Ct. App. No. 39483-2-III (2023)); *see also* *State v. O'Connell*, 83 Wn.2d 797, 816, 523 P.2d 872 (1974). That would be an

---

[4] We recognize that at least one other court has concluded retired judges may not testify under the evidence rules and canons. *See Joachim v. Chambers*, 815 S.W.2d 234, 240 (Tex. 1991). This appears to be the minority view. *See* Timothy E. Travers, Annotation, *Judge as a Witness in Cause Not on Trial before Him*, 86 A.L.R.3d 633 (1978) (collecting cases).

appropriate basis for an objection at trial and must be left to the sound discretion of the trial court.

We conclude the trial judge abused its discretion in striking Judge Van Doorninck as an expert witness rather than imposing appropriate limits on her testimony.

CONCLUSION

We hold that limited immunity afforded by RCW 4.24.595(1) applies to the child abuse investigation here and that the trial court abused its discretion in excluding Judge Van Doorninck's testimony. We affirm the Court of Appeals and remand to the trial court for further proceedings consistent with this opinion.

_____
González, J.

WE CONCUR:

_____
Stephens, C.J.

_____
Yu, J.

_____
Montoya-Lewis, J.

_____
Madsen, J.

_____
Whitener, J.

_____
Gordon McCloud, J.

_____
Knodell, J.P.T.

*Atkerson v. Dep't of Child., Youth & Fams.*

No. 102795-8

JOHNSON, J. (dissent)—The majority misinterprets RCW 4.24.595(1) and extends the statute far beyond its intended scope. This is a case about a special protection from negligence liability, granted by the legislature to the Department of Children, Youth, and Families (Department), that applies in connection with the occurrence of a specified event. We have been asked whether that protection can apply when that specified event will never occur. Because the absence of that event would mean that the statute simply does not apply, I respectfully dissent.

The full text of RCW 4.24.595 provides:

(1) Governmental entities, and their officers, agents, employees, and volunteers, are not liable in tort for any of their acts or omissions in *emergent placement investigations* of child abuse or neglect under chapter 26.44 RCW including, but not limited to, any determination to leave a child with a parent, custodian, or guardian, or to return a child to a parent, custodian, or guardian, unless the act or omission constitutes gross negligence. *Emergent placement investigations are those conducted prior to a shelter care hearing under RCW 13.34.065.*
     (2) The department of children, youth, and families and its employees shall comply with the orders of the court, including shelter care and other dependency orders, and are not liable for acts performed to comply with such court orders. In providing reports and recommendations to the court, employees of the department of children, youth, and families are entitled to the same witness immunity as would be provided to any other witness.

(Emphasis added.) This statute expressly creates a gross negligence standard for "emergent placement investigations," which it defines as those conducted "prior to a shelter care hearing." A shelter care hearing is a critical step in the child welfare process that is triggered by the removal or request for removal of a child,[1] and it signifies a time-sensitive determination of a child's immediate safety. Contrary to the majority's reading, tying immunity to this specific point in the investigative process established a higher standard of liability only in those instances where swift action is necessary to protect a child from imminent harm. In the present case, no shelter care hearing was ever scheduled. The investigation, therefore, did not fall within the statutory definition of an "emergent placement investigation." RCW 4.24.595(1) does not apply.

The majority's interpretation seemingly extends immunity to *all* investigations until a shelter care hearing is held, even if one is never held at all. It is the majority extending the statutory immunity to investigations where a shelter care hearing never occurs or would never occur that is inconsistent with the plain text of the statute that limits this immunity to "emergent placement investigations." As the Washington State Association for Justice Foundation pointed out succinctly

---

[1] RCW 13.34.065(1)(a) ("When a child is removed or when the petitioner is seeking the removal of a child from the child's parent, guardian, or legal custodian, the court shall hold a shelter care hearing within 72 hours.").

in amicus briefing, the court must avoid interpretations that render statutory language meaningless, and the majority's reading renders the entire phrase "emergent placement investigation" meaningless. Br. of Amicus Curiae Wash. State Assoc. for Justice Found. at 15-18. The word "emergent" becomes meaningless because the majority assumes the investigation need not involve a situation requiring immediate action; the words "placement investigation" become meaningless because the majority assumes the investigation need not involve the placement process; and statute's definition of "emergent placement investigation" becomes meaningless because the majority assumes the immunity applies even where no shelter care hearing has been triggered, despite the definition's clear requirement that the protection applies only to investigations that are conducted "prior to a shelter care hearing."

Rather, what the statute says is that subsection (1) of RCW 4.24.595 establishes a short-term period (the 72 hours between triggering the "emergent placement investigation" and the occurrence of the shelter care hearing) where the State has heightened protection from negligence liability until the Department's actions are judicially reviewed and either confirmed or rejected by a judicial officer. At that point, subsection (2) then operates to shield the Department from liability so long as the court's orders are then followed. Contrary to this text, the

majority's interpretation results in the heightened standard of liability applying for an unlimited window of time in cases where no shelter care hearing occurs.

The Department argues that the statute does not condition the protection on the triggering of a shelter care hearing because the statute covers "determination[s] to leave a child with a parent, custodian, or guardian." But a shelter care hearing can certainly be triggered in circumstances where the Department has made such a determination. A shelter care hearing can be triggered under RCW 13.34.065(1)(a) where the Department is *seeking* removal, but the Department can then choose to "leave" the child with a parent, custodian, or guardian for the 72-hour period before the shelter care hearing occurs. In fact, when the Department makes a determination about the placement of a child pending a shelter care hearing, the Department is required to prioritize placement with blood relatives, including noncustodial parents, stepparents and adopted parents. RCW 13.34.060(2) ("[P]riority placement for a child in shelter care, pending a court hearing, shall be with any person described in RCW 74.15.020(2)(a)"); RCW 74.15.020(2)(a) (listing qualifying persons related to the child, including "[a]ny blood relative," "[s]tepfather," "stepmother," and a "person who legally adopts a child").

The majority's expansive reading of the statute not only contravenes legislative intent but also jeopardizes the fundamental rights of children. By granting heightened immunity for all stages of a child abuse investigation, regardless of its urgency, the majority's decision risks shielding the government from its negligent actions, even when its negligence or misconduct directly causes serious harm or even the death of a child. I dissent.

Johnson, J.